UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

AQUARIUS JOHNSON,

                    Petitioner,                          Case No. 1:21-cv-456

v.                                                       Honorable Paul L. Maloney

LES PARISH,

                    Respondent.
_____/

## OPINION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Aquarius Johnson is incarcerated with the Michigan Department of Corrections at the Oaks Correctional Facility (ECF) in Manistee, Manistee County, Michigan. On January 13, 2016, following a two-day jury trial in the Berrien County Circuit Court, Petitioner was convicted of armed robbery, in violation of Mich. Comp. Laws § 750.529, felon in possession of a firearm (felon-in-possession), in violation of Mich. Comp. Laws § 750.224f, and use of a firearm during the commission of a felony (felony-firearm), in violation of Mich. Comp. Laws § 750.227b. On February 23, 2016, the court sentenced Petitioner as a second habitual offender, Mich. Comp. Laws § 769.10, to concurrent prison terms of 13 to 30 years for armed robbery and 2 years, 4 months to 7 years, 6 months for felon-in-possession. Those sentences, in turn, were to be served consecutively to a sentence of 2 years for felony-firearm.

Petitioner initiated federal habeas proceedings on March 15, 2021, by filing his habeas corpus petition in the United States District Court for the Eastern District of Michigan. (ECF No. 1.) In an opinion and order (ECF No. 2) entered on June 3, 2021, that court transferred the

matter to this Court for further proceedings. In an order (ECF No. 6) entered on June 15, 2021, this Court directed Petitioner to file an amended habeas corpus petition within 28 days. The Court received Petitioner's amended habeas petition on July 6, 2021. (ECF No. 8.) In his amended petition, Petitioner raises two grounds for relief, as follows:

I.      Petitioner was denied a full and fair opportunity to appeal his conviction on the first-tier appeal when appel[l]ate attorney George B. Mullison . . . failed to brief and argue colorable and meritorious claims requested by the petitioner of the "ineffective assistance of trial counsel" who failed to object to the in-court identification [which] was unreliable and based upon impermissibl[y] suggesti[ve] identification procedure utilized by the prosecution . . . .

II.     Petitioner was denied the effective assistance by trial attorney Sammis . . . when counsel failed to advocate for the Petitioner by failing to object to the in-court identification based upon the impermissibl[y] suggestive procedure pretrial and for failing to motion the court to conduct an "Wade" evidentiary hearing to test the reliability of the identification evidence proffered . . . .

(Am. Pet., ECF No. 8, PageID.18–25.) Respondent asserts that Petitioner's grounds for relief are meritless.[1] (ECF No. 13.) For the following reasons, the Court concludes that Petitioner has failed to set forth a meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

---

[1] Respondent also contends that Petitioner's ineffective assistance of trial counsel claims are procedurally defaulted because he raised them in his motion for relief from judgment "despite state law that requires defendants to present claims in their direct appeal." (ECF No. 13, PageID.115–116.) Respondent, however, recognizes that a habeas corpus petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See* 28 U.S.C. § 2254(b)(2). Furthermore, the Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. MaCauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix*, 520 U.S. at 525; *Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997); 28 U.S.C. § 2254(b)(2)). Here, rather than conduct a lengthy inquiry into exhaustion and procedural default, the Court finds that judicial economy counsels that the better approach is to go directly to a discussion of the merits of Petitioner's claims.

## Discussion

I.      **Factual Allegations**

The Michigan Court of Appeals described the facts underlying Petitioner's conviction as follows:

> The robbery occurred on the morning of July 28, 2015. The victim, who testified through a Spanish language interpreter, walked from her place of employment, a charter school, to a nearby gas station to purchase lunch. While walking back from the gas station, she noticed two people running up behind her. She did not know why they were running, but when they got close to her one of them said, "She, she," and then, "Get it. Get it." One grabbed her from behind and the other put a pistol to her chest. The man who held the pistol to her chest grabbed her bag from the store and threw the things on the ground. The bag had the items she bought from the store and her wallet in it. She had her "papers and $20" in her wallet. The man with the pistol took her wallet from the bag and then both men ran in the direction of the charter school; then they ran off together in the direction of an apartment complex behind the school. The victim returned to the school and contacted the police, who found the victim to be distraught and to have urinated on herself; she also had a welt on her chest around her sternum.

> The responding officer testified that the victim described both men as having "braid hair styles." The man with the gun wore a light colored shirt and jeans and had something black on his shoulder; and the other was skinnier and wore a dark shirt and dark pants. He testified that the victim described the men as being between 5'6" and 5'10" in height, although his report indicated that she had described them as being from 5'10" to 5'11" in height. She also told him that she had earlier seen the men at the gas station where she purchased her food. The victim testified that she had noticed the two men who robbed her while she was in the store because the man with the gun had been next to her when she paid. The officer reviewed security footage from the gas station and identified two men in the video who matched the victim's description of the perpetrators.

> Defendants were detained at the apartment complex an hour and a half to two hours after the robbery. Officers identified them as the men in the gas station security footage; however, they were not wearing the same clothing. Isom had an apartment in the complex, which officers searched with his permission. They found a blue bag, .38 caliber bullets, a gun lock, and a "corner baggie" containing a substance that tested positive for cocaine. Neither a firearm nor the victim's money or effects were ever recovered. Johnson admitted to officers that he had stayed the night at Isom's apartment; in an interview with police, he denied having gone to the gas station, but later admitted that he, in fact, had gone there after he was shown a picture from the security video.

3

*People v. Johnson*, Nos. 332043, 332296, 2017 WL 3614183, at *1–2 (Mich. Ct. App. Aug. 22, 2017).[2]

Jury selection began on January 12, 2016. (Trial Tr. I, ECF No. 14-7.) Over the course of two days, the jury heard testimony from law enforcement officers and the victim. (Trial Tr. I & II, ECF Nos. 14-7, 14-9.) After about three and a half hours of deliberation, the jury reached a guilty verdict on January 13, 2016. (Trial Tr. II, ECF No. 14-9, PageID.1240–1242.) Petitioner appeared before the trial court for sentencing on February 23, 2016. (ECF No. 14-10.)

Petitioner, with the assistance of counsel, directly appealed his convictions and sentences to the Michigan Court of Appeals, arguing that "there was insufficient evidence that [he and Isom] were involved and that they were denied fair trials by joining their charges for a single trial." *Johnson*, 2017 WL 3614183, at *1. Petitioner argued further that the trial court "violated the ex post facto clauses of the United States Constitution and the Michigan Constitution by applying the decision in *People v. Lockridge*, 498 Mich. 358; 870 N.W.2d 502 (2015), to his sentencing." *Id.* at *4. Petitioner also argued that counsel was ineffective for asking "the victim whether the perpetrator who had the gun was in the courtroom" and for "failing to object to the admission of the evidence that a gun lock, ammunition, and cocaine were found in Isom's apartment." *Id.* at *6. Finally, Petitioner raised several claims of error in a brief he submitted on his own behalf. *Id.* at *7. The court of appeals affirmed Petitioner's convictions and sentences on August 22, 2017. *Id.* at *1. On April 3, 2018, the Michigan Supreme Court denied Petitioner's application for leave to appeal. *People v. Johnson*, 909 N.W.2d 233 (Mich. 2018).

On December 26, 2018, Petitioner filed a motion for relief from judgment pursuant to Michigan Court Rule 6.500, raising at least the two issues he presents in his amended habeas

---

[2] Petitioner's appeal was consolidated with the appeal filed by his co-defendant, Anthony Isom.

4

corpus petition. (ECF No. 14-14, PageID.1640.) By order entered on April 3, 2019, the trial court denied Petitioner's motion. (*Id.*, PageID.1639–1643.) The Michigan Court of Appeals and Michigan Supreme Court denied Petitioner's applications for leave to appeal on November 21, 2019, and July 28, 2020, respectively. (*Id.*, PageID.1603; ECF No. 14-15, PageID.1673.) Petitioner then moved for reconsideration, which the supreme court denied by order entered on October 27, 2020. (ECF No. 14-15, PageID.1666–1672.) This § 2254 petition followed.

## II.     AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000);

*Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and

convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id*. (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## III. Discussion

Petitioner's grounds for relief both concern alleged ineffective assistance by trial and appellate counsel. In his first ground for relief, Petitioner contends that appellate counsel failed to "brief and argue colorable and meritorious claims" that trial counsel was ineffective for "fail[ing] to object to the in-court identification [which] was unreliable and based upon [an] impermissibl[y] suggesti[ve] identification procedure." (Am. Pet., ECF No. 8, PageID.18.) In his second ground

7

for relief, Petitioner asserts that trial counsel was ineffective for failing to object to the in-court identification and for failing to request that the trial court conduct a *Wade*[3] hearing to test the reliability of the identification. (*Id.*, PageID.23–24.)

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

The *Strickland* standard that applies to trial counsel also applies to appellate counsel. However, a criminal appellant has no constitutional right to have every non-frivolous issue raised on appeal. Rather, "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate

---

[3] *United States v. Wade*, 388 U.S. 218 (1967).

advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . ." (citing *Harrington*, 562 U.S. at 102)).

A.      **Ineffective Assistance of Trial Counsel**

As his second ground for relief, Petitioner contends that trial counsel rendered ineffective assistance by failing to object to the "in-court identification based upon the impermissibl[y] suggestive procedure pretrial" and for failing to ask that the court conduct a *Wade* hearing. (Am. Pet., ECF No. 8, PageID.23–24.) According to Petitioner, the prosecution did not offer any identification of Petitioner during its direct examination of the victim. (*Id.*, PageID.25.) Instead, the victim made her first in-court identification of Petitioner during cross-examination. (*Id.*)

9

Petitioner contends that while he was seeking post-conviction relief, he retained a private investigator, who ascertained that the victim had been shown a single photograph of Petitioner prior to her testimony "to assist her with making an identification." (*Id.*) Based upon this information, Petitioner contends that counsel should have challenged the identification evidence and requested that the trial court hold a *Wade* hearing. (*Id.*)

Petitioner raised this argument in his motion for relief from judgment and attached a copy of the private investigator's report. That report is dated August 25, 2018. (ECF No. 14-14, PageID.1627.) On that date, the private investigator and a Spanish interpreter met with the victim. (*Id.*, PageID.1629.) During the interview, the victim reiterated that she had been unable to "pick any of the 6 men in the [police] lineup as being the person who pointed the gun" at her. (*Id.*, PageID.1630.) The victim stated that during the lineup, she "was really nervous and confused." (*Id.*, PageID.1631.) She was able to identify Petitioner's face in person in court because "both men were put right in front of her." (*Id.*) The victim told the private investigator that she was "shown pictures of both men before she went to court and they also showed her video from the gas station where she purchased the food." (*Id.*) When she was shown the pictures, "she told the police that [Petitioner] was the one who pointed the gun at her (even though [s]he didn't know his name) because she recognized his hair and his face." (*Id.*) When the victim was in court, she "recognized the man with the gun by his hair and his face." (*Id.*) The victim was "sure that she would have picked out the one who aimed the gun at her in the courtroom even if she had not been shown a photo of him prior." (*Id.*) The private investigator asked if the victim would be willing to sign a sworn affidavit regarding the information provided; the victim responded that "she doesn't really want to be involved with this anymore." (*Id.*, PageID.1634.)

Underlying Petitioner's ineffective assistance claim is his belief that his identification by the victim was obtained through unduly suggestive procedures. Due process protects the accused against the introduction of evidence which results from an unreliable identification obtained through unnecessarily suggestive procedures. *Moore v. Illinois*, 434 U.S. 220, 227 (1977). "Most eyewitness identifications involve some element of suggestion." *Perry v. New Hampshire*, 565 U.S. 228, 244 (2012. It is not enough that the identification procedure employed "may have in some respects fallen short of the ideal." *Simmons v. United States*, 390 U.S. 377, 385-86 (1968); *see also Neil v. Biggers*, 409 U.S. 188, 201 (1972). Instead, "due process concerns arise only when law enforcement officers use[d] a procedure that is *both* suggestive and unnecessary." *Perry*, 565 U.S. at 238 (emphasis in original) (citing *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977)). Further, even when an unnecessarily suggestive procedure was used, "suppression of the resulting identification is not the inevitable consequence." *Id.* at 239. In such cases, "the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Id*. (quoting *Biggers*, 409 U.S. at 201). "'[R]eliability [of the eyewitness identification] is the linchpin' of that evaluation." *Id.* at 239 (quoting *Manson*, 432 U.S. at 114). "The factors affecting reliability include 'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.'" *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2559 (2018) (quoting *Manson*, 432 U.S. at 114); *see also Perry*, 565 U.S. at 239; *Biggers*, 409 U.S. at 199–200. "The 'corrupting effect of the suggestive identification' must be weighed against factors indicating that the eyewitness identification is reliable . . . ." *Williams v. Bauman*, 759 F.3d 630, 639 (6th Cir. 2014) (quoting *Manson*, 432 U.S. at 114).

A criminal defendant has the initial burden of proving that the identification procedure was impermissibly suggestive. It is only after a defendant meets this burden of proof that the burden then shifts to the prosecutor to prove that the identification was reliable independent of the suggestive identification procedure. *See United States v. Wade*, 388 U.S. 218, 240, n.31 (1967). If a defendant fails to show that the identification procedures are impermissibly suggestive, or if the totality of the circumstances indicate that the identification is otherwise reliable, no due process violation has occurred. *See United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992).

Furthermore, in *Wade*, the Supreme Court considered whether a post-indictment lineup for identification purposes constituted a critical stage of criminal proceedings such that the defendant's Sixth Amendment rights were violated by the absence of counsel. *Wade*, 388 U.S. at 223–25. The Court concluded that a pretrial identification lineup is a critical stage of proceedings but rejected a *per se* exclusionary rule barring the admission of such identification. *Id.* at 232–34, 240. Instead, the Court instructed that trial courts conduct a hearing to consider several factors, including:

> [1] the prior opportunity to observe the alleged criminal act, [2] the existence of any discrepancy between any pre-lineup description and the defendant's actual description, [3] any identification prior to lineup of another person, [4] the identification by picture of the defendant prior to the lineup, [5] failure to identify the defendant on a prior occasion, and [6] the lapse of time between the alleged act and the lineup identification.

*Id.* at 240.

The trial court explicitly applied *Strickland* when addressing Petitioner's claims in its order denying Petitioner's motion for relief from judgment. (ECF No. 14-14, PageID.1641.) The state court's application of the correct standard eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in *Williams v. Taylor*:

> The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New

12

International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

*Williams*, 529 U.S. at 405. The Court went on to offer, as an example of something that is not "contrary to" clearly established federal law, the following:

> [A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

*Id.* at 406. Therefore, because the Michigan Court of Appeals applied the correct standard Petitioner can only overcome the deference afforded state court decisions if the determination of Petitioner's sufficiency is an unreasonable application of *Strickland* or if the state court's resolution was based on an unreasonable determination of the facts. 28 U.S.C. 2254(d).

The trial court noted that while Petitioner argued that the "prosecution improperly helped [the victim] identify [Petitioner] with pictures after she failed to identify [Petitioner] in a line-up," Petitioner "never assert[ed] that his trial counsel had information regarding the improperness of [the victim's] identification of" Petitioner. (*Id.*, PageID.1641–1642.) The court further noted: "During trial, [Petitioner's] counsel asked [the victim] if she was able to identify her assailant, at

13

which time she pointed at [Petitioner]. Additionally, in his brief, [Petitioner] concedes that [the victim] did successfully identify him in the preliminary proceedings." (*Id.*)

Petitioner and his co-defendant also raised challenges to the sufficiency of the identification evidence on direct appeal. The court of appeals rejected those challenges, stating:

> At trial, the victim positively identified [Petitioner] as the man who held the gun to her chest, which was sufficient by itself to support the identity element. See *People v Davis*, 241 Mich. App. 697, 700; 617 N.W.2d 381 (2000). [Petitioner] challenges her credibility, but we do not interfere with the jury's role in evaluating a witness's credibility, even if the witness's testimony is vague or inconsistent. *People v. Mehall*, 454 Mich. 1, 6; 557 N.W.2d 110 (1997); see also *Wolfe*, 440 Mich. at 514–515. We may only disregard testimony when it has been deprived of all probative value or is such that a rational jury could not believe it. *People v Lemmon*, 456 Mich 625, 645–646; 576 N.W.2d 129 (1998).
>
> The victim described the robbers as having braided hair. [Petitioner] and Isom both had braided hair. She described the man in white, [Petitioner], as being chunkier and dark-skinned. Both of those descriptions are relative and are influenced by the conditions attending the witness's observation, such as clothing and lighting, and involve some level of subjectivity. A reasonable jury could conclude that her description of [Petitioner] was accurate under the totality of the circumstances. There was also some testimony that the victim described one of the robbers as being shorter—5'3"—but there was also testimony that she stated that they were approximately 5'10" in height. She also indicated that the man who held her arms wore black, whereas Isom was wearing blue in the videos. The variations in her statements and any discrepancies between her original description and the video evidence were not so significant that this Court would be justified in disregarding her testimony and were certainly all presented to the jury.
>
> The victim admitted that she did not see the face of the man who grabbed her from behind, and she was unable to pick anybody out of a six-person lineup she viewed after the robbery. However, she also testified that the men who robbed her were the same men she saw at the store. An officer testified that she told him that same thing when he responded to the call about a robbery just minutes after the event. She described the men and, although there were some discrepancies, [Petitioner] and Isom's appearance matched her description. The victim testified that the men ran off toward the River Terrace Apartments after the robbery, and an officer testified that [Petitioner] and Isom were arrested at the apartments about an hour and a half to two hours later. There was ample evidence that Isom was at the store when the victim was present making her purchases, apparently arriving at the same time as [Petitioner] and exchanging a look with [Petitioner] as they left. Additionally, the evidence indicates that she had some opportunity to observe the man as he ran up to her and ran away, at least sufficient to match general characteristics with that of a person at the gas station notwithstanding misidentifying blue clothing as black.

Defendants' change of clothing shortly after their presence at the gas station and after the robbery might have an innocent explanation, but a rational jury could also reasonably infer that they did so for the purpose of evading arrest by altering their appearances. See *People v. Kowalski*, 489 Mich. 488, 509 n 37; 803 N.W.2d 200 (2011). The jury could also consider the incongruity of possessing ammunition and a gun lock without a gun as circumstantially supporting a finding of guilt.

*Johnson*, 2017 WL 3614183, at *2.

During Petitioner's preliminary examination, the victim testified that after she left the gas station, two people ran up to her. (Prelim. Exam. Hr'g Tr., ECF No. 14-2, PageID.156.) One of the individuals grabbed her from behind, and the other put a gun to her chest. (*Id.*) The victim testified that after the individuals took her wallet, they ran and "turned into some apartments that are close by." (*Id.*, PageID.158.) The victim testified that the individual who was holding the gun was wearing jeans and a white shirt. (*Id.*, PageID.158–159.) The victim also testified that she had been shown a DVD containing video footage from behind the counter at the gas station, and that she saw the two people who robbed her on that footage. (*Id.*, PageID.162.) She stated that she could recognize the person who put the gun to her chest from that video because she "got a good look at his face when he put the gun to [her] chest." (*Id.*, PageID.164.)

On cross-examination by Isom's attorney, the victim recalled telling officers that one of the individuals was "skinny" and that the other was "chunky." (*Id.*, PageID.165.) On cross-examination by Petitioner's attorney, the victim testified that the individual who pointed the gun at her chest had "twisted" long hair. (*Id.*, PageID.167.) She also testified that individual was the one wearing the white shirt. (*Id.*) The victim described that individual as being "[t]all and "[t]hicker." (*Id.*, PageID.168.) Counsel asked the victim if she remembered going to the jail for a lineup, and the victim noted that she did. (*Id.*, PageID.169.) The victim remembered seeing Petitioner's counsel there. (*Id.*, PageID.170.) She acknowledged that she did not identify the individual who had been holding the gun from any of the six men included in the lineup. (*Id.*)

The victim's description of the perpetrators was also thoroughly addressed during Petitioner's trial. On direct examination, the victim testified that the individual who was holding the gun had a white shirt and long hair. (Trial Tr. II, ECF No. 14-9, PageID.1026.) She noted that the hair was loose. (*Id.*) The victim testified that the individual was wearing blue pants and had dark skin. (*Id.*, PageID.1028.) The victim noted that she had seen the two individuals before in the gas station, and that the "heavier one" had been standing near her when she was paying for her purchases. (*Id.*, PageID.1029.) She testified that the "heavier one" was the individual with the gun. (*Id.*, PageID.1030.)

During cross-examination by Petitioner's counsel, the victim noted that she had watched the footage from the gas station on one occasion prior to trial and on one occasion before the preliminary examination. (*Id.*, PageID.1042.) She averred that no one had ever told her that the two people in the video were the individuals who had robbed her. (*Id.*) The victim testified that the individual who was holding the gun had his face always pointed towards her, and that she remembered his face. (*Id.*, PageID.1043.) Counsel also asked the victim about the lineup. (*Id.*, PageID.1046–1048.) The victim acknowledged that she was unable to identify either of the perpetrators from that lineup. (*Id.*, PageID.1048.) She stated that she commented that she "felt the subject was chunkier and had a little longer hair." (*Id.*) Counsel then asked the victim if the individual who pointed the gun at her and robbed her was in the courtroom, and the victim pointed to Petitioner. (*Id.*, PageID.1049–1050.) The victim also testified that even though she had not been asked during Petitioner's preliminary examination if the individual who had the gun was in the courtroom that day, she had seen the individual there. (*Id.*, PageID.1050.)

Upon review of the record, trial counsel thoroughly probed the identification evidence during both the preliminary examination and the trial. Petitioner has not demonstrated that counsel

16

was ineffective for failing to raise any sort of suggestiveness challenge to the identification processes used. Nothing in the record allows the Court to conclude that the lineup was unduly suggestive—especially given the victim's failure to identify either of the perpetrators from the lineup. Moreover, nothing in the record suggests that the video footage shown to the victim was unduly suggestive.

Petitioner instead claims that the identification procedures were unduly suggestive because the prosecutor allegedly showed a single photograph of Petitioner to the victim "to assist her with making an identification." (Am. Pet., ECF No. 8, PageID.25.) To support this argument, Petitioner relies upon a private investigator's report from August 25, 2018, well more than two years after Petitioner was convicted at trial. This report, however, relies upon unsworn hearsay answers provided by the victim during her interview by the private investigator. Moreover, the report itself is unsworn. Petitioner offers no corroborating proof from either the victim or the private investigator in the form of sworn affidavits. Tellingly, the record is also devoid of any indication that trial counsel had any basis to believe that the prosecution improperly steered the victim to identify Petitioner by showing her a single photograph. *See Wilson v. Mitchell*, 250 F.3d 388,  397 (6th Cir. 2001) (assuming that presenting the witness with only two photographs where only one photograph was of a man with the same hairstyle described by the witness was unduly suggestive). Furthermore, nothing in the record casts doubt on the reliability of the victim's testimony. Under these circumstances, there was simply no basis for trial counsel to challenge the identification procedures and to request a *Wade* hearing. *See Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005) (concluding that counsel's failure to challenge the witnesses' identifications did not prejudice the petitioner because the identifications were sufficiently reliable even if the procedures used had been suggestive). Petitioner has failed to demonstrate that the trial court's rejection of his

ineffective assistance of trial counsel claim is contrary to, or an unreasonable application of, *Strickland*. Petitioner, therefore, is not entitled to relief on habeas ground II.

### B.   Ineffective Assistance of Appellate Counsel

As his first ground for relief, Petitioner contends that appellate counsel rendered ineffective assistance. (Am. Pet., ECF No. 8, PageID.20.) Specifically, Petitioner alleges that appellate counsel failed to "brief and argue colorable and meritorious claims" that trial counsel was ineffective for failing to object to the in-court identification of Petitioner by the victim, as well as for failing to object to the "impermissibl[y] suggesti[ve] identification procedure utilized by the prosecution to ascertain an identification of the Petitioner." (*Id.*)

Petitioner raised this argument in his motion for relief from judgment, and the trial court rejected it, summarily stating that because Petitioner "has not shown that trial counsel's performance prejudiced [him], appellate counsel cannot be found ineffective for failure to raise this issue." (ECF No. 14-14, PageID.1643.) As thoroughly discussed *supra*, Petitioner's claim of ineffective assistance of trial counsel lacks merit. Accordingly, "his appellate counsel's failure to raise that claim on direct appeal cannot be deemed constitutionally deficient performance." *Willis v. Smith*, 351 F.3d 741, 746 (6th Cir. 2003); *see also Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001) ("If trial counsel performed adequately, our inquiry is at an end; by definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit."). Moreover, as noted above, appellate counsel challenged the sufficiency of the identification evidence on direct appeal. *See Johnson*, 2017 WL 3614183, at *2–3. Petitioner has not demonstrated that the trial court's rejection of his ineffective assistance of appellate counsel claim is contrary to, or an unreasonable application of, *Strickland*. Petitioner, therefore, is not entitled to relief on habeas ground I.

## IV.   Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of

appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## **Conclusion**

The Court will enter a judgment denying the petition and an order denying a certificate of appealability.


Dated:   August 24, 2023                      /s/ Paul L. Maloney
                                              Paul L. Maloney
                                              United States District Judge